

IN THE

# Court of Appeals of Indiana

Brent M. Haycraft,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

May 13 2025, 8:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

May 13, 2025

Court of Appeals Case No.
23A-CR-2088

Appeal from the Martin Superior Court

The Honorable Isha E. Wright-Ryan, Judge

Trial Court Cause No.
51C01-2006-CM-98

---

**Opinion by Judge Pyle**
Judges May and Brown concur.

**Pyle, Judge.**

## Statement of the Case

After being terminated from his employment, Brent Haycraft ("Haycraft") made three Facebook posts, two of which included comments, on March 23, 2020 ("the March 23 Facebook post"), April 30, 2020 ("the April 30 Facebook post and comments"), and June 12, 2020 ("the June 12 Facebook post and comments"). Based on these Facebook posts and comments, the State charged Haycraft with Class A misdemeanor intimidation[1] and Level 6 felony intimidation[2] of Shawn O'Connor ("O'Connor"), the supervisor who had terminated Haycraft's employment. Both charging instruments alleged that Haycraft had committed the charged offenses on March 23, April 30, and/or June 12. A jury convicted Haycraft of both offenses.

Haycraft appeals his convictions, arguing that they violate the First Amendment because the State did not present sufficient evidence that he had some understanding of his statements' threatening character and had consciously disregarded a substantial risk that his conduct would be viewed as threatening. We conclude that the State failed to present sufficient evidence that Haycraft had some understanding of the threatening character of the March 23 Facebook post and the April 30 Facebook post and comments and

---

[1] IND.CODE § 35-45-2-1(a).

[2] I.C. § 35-45-2-1(b).

that he had consciously disregarded a substantial risk that his conduct of making these posts and comments would be viewed as threatening. Accordingly, those two Facebook posts and comments do not constitute true threats and are protected by the First Amendment.

[3] We further conclude that the State presented sufficient evidence that Haycraft had some understanding of the threatening character of the June 12 Facebook post and comments and that he had consciously disregarded a substantial risk that his conduct of making this post and comments would be viewed as threatening. Accordingly, the June 12 Facebook post and comments constitute a true threat and are not protected by the First Amendment.

[4] However, because the trial court read the jury disjunctive instructions that included the and/or language set forth in the charging informations and did not provide the jury with a unanimity instruction, we are unable to determine whether the jury convicted Haycraft of Class A misdemeanor intimidation and Level 6 felony intimidation based on the March 23 Facebook post or the April 30 Facebook post and comments, which were not true threats, or based on the June 12 Facebook post and comments, which was a true threat. Therefore, we reverse Haycraft's convictions for both Class A misdemeanor intimidation and Level 6 felony intimidation and remand this case to the trial court with instructions to vacate Haycraft's convictions.

[5] We reverse and remand with instructions.

## Facts

[6] In 2018, Haycraft began working as a forklift operator at Meyer Distributing ("Meyer"). One year later, in 2019, he accepted a "high-performance" sales position at Meyer. (Tr. Vol. 4 at 129). The position involved selling race car parts and engine supplies to car shops. Austin Zehr ("Zehr") was Haycraft's supervisor.

[7] In late 2019, O'Connor became Haycraft's supervisor, and "everything at [Haycraft's] job changed." (Tr. Vol. 4 at 130). Specifically, Haycraft's job became more about metrics than customer service. In addition, O'Connor's management style, which was "direct . . . [and] in your face[,]" was quite different from Zehr's management style. (Tr. Vol. 3 at 102). Over time, Haycraft and O'Connor developed a "[v]ery hostile[]" relationship. (Tr. Vol. 4 at 132).

[8] On March 23, 2020, O'Connor terminated Haycraft's employment and spoke to Haycraft in a "provoking" and "profanity[-]laced" manner as he escorted Haycraft to his car. (Tr. Vol. 4 at 133). Immediately following his termination, Haycraft deleted all but three of his Meyer co-workers from his list of Facebook friends. He considered those three co-workers, including Zehr, to be friends because they had socialized together outside of work. Further, Haycraft believed that those three co-workers knew him well enough to know when he was venting.

[9] That same day, March 23, 2020, Haycraft posted the following as private to friends only on Facebook:

You know these are the times that should be considered when you buy a weapon… can you maintain yourself when you are upset and your life is destroyed. .  I would advise anyone from buying a gun no matter what if you have a bad temper you cant control… I got fired from my job today, was supposed to close on my home in 2 weeks…  I Have a new 45 and over 100 rounds of fmj and hollowpoints.  A year or so ago i would lose my head and probably do something so stupid id be the next person on tv … I have grown enough as a person that I have faith life will work its way out and extreme measures are not how you handle business. Gun control isn't the solution. You cant tell if someone is going to hit this low and not have self control.  Right now i feel my life is destroyed and im going to lose everything. No amount of background checks will ever know how someone would act in this situation.

(Ex. Vol. 1 at 19) (errors in the original).

[10]   Zehr and other employees showed the post to O'Connor, who did not have a Facebook account.  O'Connor reported the post to Meyer's human resources department.  It appears that someone in the human resources department may have reported the post to the Jasper Police Department.  However, the record does not reveal whether the police department followed up on the report.

[11]   Five weeks later, on April 30, 2020, Haycraft posted the following as private to friends only on Facebook:

Day 2 of 5 hours on the phone for unemployment… woohoo Glad bullys want to fight my unemployment.  Cant wait till my eeoc hearing date i guess if i lose i just take my ride to prison fuck it…

(Ex. Vol. 1 at 20) (errors in original).

[12]    Throughout that day, Haycraft posted the following comments in response to comments on the post:

> I worked there 2 years
>
> Im tired of being treated like a pos when I tried so damn hard… its been my whole life… im done being bullied this is the last time…
>
> And i got fucking bullied for 2 months… more shit than I've taken from anyone as an adult.. i got told to shut my mouth by a grown man while he was writing me up for doing what he told me to do.
>
> Well ive decided im gonna handle it one way or another… dude fired me 2 weeks before i closed on my house.. so since he wants to fuck me ill get revenge… might go to prison forever but fuck it
>
> ive been bullied my whole life.. im sick of it.. i literally ask for a raise… after 2 years no raise.. they changed my manager, expected me to do over 2x the work as everyone else. The dude punked me out everyday for 2 months… and i took it because i had to have my job to close on my house
>
> He set me up to fail all the time. I had to spend 34hrs a week on the phone to meet his numbers…(from around 15hrs of phone time a week) he told me to cut my hours on a 6 day work week to keep them under 40. I took 2 hours off beginning of my shift to make it happen he wrote me up for it. Then when i tried to state i was doing what he told me to do he told me to shut my mouth…
>
> I made those pricks 5 million dollars in a year… from a bunch of accounts that hated the company…
>
> I just wanted to close on my house so i could build a garage. I would have happily resigned after i closed on my house… the fact that he fucked me on getting a garage is making me insane. I

need a garage i need my space for my sanity. I need to work on my shit and i needed it to start the business i want to start

I dont want to sit here and drink all the time. I dont want to not have motivation but i have no space to accomplish the shit i need to accomplish.

I literally post this on facebook because i need people to remind me how stupid it is.. at my darkest moments sometimes i lose sight of everything. I just want to get back at people sometimes.. people have always taken everything from me.. and im so sick of it.

(Ex. Vol.1 at 20-25) (errors in the original).

[13] Zehr and other employees showed the post to O'Connor, who reported the post to Meyer's human resources department. It is unclear from the record which comments Haycraft had posted when O'Connor saw the post. Someone in the human resources department contacted the Indiana State Police.

[14] Indiana State Police Sergeant Detective Brock Werne ("Sergeant Werne") received the report and instructed Indiana State Police Detective Jarrod Lents ("Detective Lents") to go to Haycraft's house and "tell him to knock off the Facebook posts and the comments he was making." (Tr. Vol. 4 at 36). Detective Lents went to Haycraft's home and told him to stop making the Facebook posts and comments because his former employer had considered them to be threatening in nature. Detective Lents did not record his conversation with Haycraft or write a report about it because no charges were going to be filed against Haycraft. Following his conversation with Detective Lents, Haycraft set all of his Facebook settings to private and unfriended the

three people at Meyer who he had previously left as Facebook friends. At that point, Haycraft believed that he had taken all steps necessary to keep his Facebook posts private and that he had secured his account. Further, Haycraft did not believe that he had any remaining Facebook friends who would show his posts to O'Connor.

[15] In June 2020, Haycraft had an interview scheduled at the Equal Employment Opportunity Commission ("the EEOC") and was "really excited that something was going to come of it[.]" (Tr. Vol. 4 at 110). However, when the interview did not go as Haycraft had hoped, on June 12, 2020, he posted the following as private to friends only on Facebook:

> This is why we have so much violence and mass shootings… this is how that shit happens. If i didnt have children id just go shoot that punk ass bitch right between the eyes… i hope i see him at the store im gonna provoke him to get him to hit me then im gonna chew his fucking face off like a zombie. I dont wanna kill him i just wanna leave him remembering last time he treated someone like shit… maybe missing an eyeball and looking like Voldemort

(Ex. Vol. 1 at 26) (errors in original).

[16] Just minutes later, Haycraft posted the following comments in response to a comment on this post:

> Piece of shit ex employer
>
> So the eeoc pretty much just told me mike braun is the equivalent to a modern day slave driver… works you right at poverty line… if you get assistance they will fire you… indiana has zero

protections for its employees against hostile work environments unless is race or sex related… so woo hoo. . stay tuned for the next chapter of my life… some will be shocked others know whats coming.  LOL good chatting

(Ex. Vol. 1 at 26-27) (errors in the original).

[17]    Shortly thereafter, Haycraft's longtime girlfriend, Heidi Weaver ("Weaver"), who did not like Haycraft posting about their private lives on Facebook, asked him to delete the post.  Haycraft complied with Weaver's request.  However, before Haycraft had deleted the post and the comments, someone saw them and forwarded screen shots of them to O'Connor.  Someone in Meyer's human resources department reported the post and comments to the Indiana State Police.

[18]    Sergeant Werne instructed Detective Lents to return to Haycraft's house and determine whether the Facebook post and comments had been directed at O'Connor or Mike Braun ("Braun").[3]  On June 13, 2023, Detective Lents went back to Haycraft's house and recorded his conversation with Haycraft.  Detective Lents asked Haycraft if he remembered him and reminded Haycraft that he had previously told Haycraft to "knock off the facebook threats[.]"  (Ex. Vol. 1 at 29).  Haycraft responded that he had not made any threats and that he had been "venting."  (Ex. Vol. 1 at 29).  Detective Lents asked Haycraft if he had been "talking about Mike Braun or . . . about [O'Connor.]"  (Ex. Vol. 1 at

---

[3] Mike Braun owns Meyer and was a United States senator at the time the events in this case took place.

30). Haycraft responded that he had been "mad towards [O'Connor.]" (Ex. Vol. 1 at 30). Haycraft further told Detective Lents that he had deleted the Facebook post within ten minutes after posting it because his girlfriend had gotten angry with him as soon as he had posted it.

[19] While speaking with Haycraft, Detective Lents telephoned someone and told the person that "it wasn't intended a threat but was made to his boss, not Mike Braun. . . . [Haycraft] said he was just blowing off steam." (Ex. Vol. 1 at 31). Detective Lents ended his telephone call and asked Haycraft if the June 12 Facebook post was "over the same issue as before[.]" (Ex. Vol. 1 at 32). Haycraft responded that he had "made [Meyer] two million dollars in two months. . . . And . . . they changed [his] manager to [O'Connor]. . . . And [O'Connor had] doubled [Haycraft's] work duties . . . [had] told [Haycraft] to shut [his] mouth, . . . [had] told [Haycraft] to do things and then [had written Haycraft] up for doing what he [had] told [Haycraft] to do." (Ex. Vol. 1 at 32-33). Haycraft further told Detective Lents that he had been angry because his interview with the EEOC had not gone as he had hoped it would. Detective Lents responded that he could understand that Haycraft had been angry but told Haycraft that he did not want to see him again.

[20] Four days later, on June 17, 2020, the State charged Haycraft with Class A misdemeanor intimidation. The charging information alleged that with his June 12 Facebook post, Haycraft had "communicate[d] a threat to Shawn O'Connor, with the intent that Shawn O'Connor be placed in fear of retaliation

for terminating Brent Haycraft's employment, a prior lawful act." (App. Vol. 2 at 31).

[21] Fifteen months later, in September 2021, the State filed a motion to amend the charging information by adding a second count alleging that Haycraft had committed Level 6 felony intimidation. The trial court granted the State's motion, and the State amended the charging information. Specifically, Count 2 alleged that with his June 12 Facebook post, Haycraft had "communicate[d] a threat to commit Battery Resulting in Moderate Bodily Injury, a forcible felony, to Shawn O'Connor, with the intent that Shawn O'Connor be placed in fear of retaliation for terminating Brent Haycraft['s] employment, a prior lawful act." (App. Vol. 2 at 79).

[22] Nearly eighteen months later, in June 2023, the State filed a motion to amend the charging information "only with regard to corrected dates[.]" (App. Vol. 2 at 198). The trial court granted the State's motion over Haycraft's objection, and the State charged Haycraft as follows:

INTIMIDATION
A CLASS A MISDEMEANOR
COUNT 1

\*       \*       \*       \*       \*

That on or about March 23, 2020, April 30, 2020 and/or June 12, 2020, in Martin County, State of Indiana, Brent M. Haycraft did communicate a threat to Shawn O'Connor, with the intent that Shawn O'Connor be placed in fear o[f] retaliation for terminating Brent Haycraft's employment, a prior lawful act.

\*       \*       \*       \*       \*

INTIMIDATION
A LEVEL 6 FELONY
COUNT II

\*     \*     \*     \*     \*

> That on or about March 23, 2020, April 30, 2020 and/or June 12, 2020, in Martin County, State of Indiana, Brent M. Haycraft did communicate a threat to commit Battery Resulting in Moderate Bodily Injury, a forcible felony, to Shawn O'Connor, with the intent that Shawn O'Connor be placed in fear o[f] retaliation for terminating Brent Haycraft's employment, a prior lawful act.

(App. Vol. 2 at 213).

[23] At the beginning of Haycraft's three-day trial in July and August 2023, the trial court read the jury the preliminary instructions, which included the charging informations alleging that Haycraft had committed the charged offenses on or about March 23, 2020, April 30, 2020, and/or June 12, 2020. In addition, the jury heard the facts as set forth above. The trial court also admitted into evidence copies of Haycraft's Facebook posts and comments as well as an audio recording of Detective Lents' June 2020 conversation with Haycraft at Haycraft's home.

[24] O'Connor testified that the March 23 Facebook post had placed him in fear "due to the content in the post[] mentioning of weapons, ammunition, just the society we will live in today." (Tr. Vol. 3 at 135). O'Connor further testified that after he had been shown the March 23 Facebook post, he had asked someone in the human resources department if he was permitted to have his firearm in his possession in his office. O'Connor also testified that the April 30

Facebook post and comments had also placed him in fear. Lastly, O'Connor testified that the June 12 Facebook post and comments had placed him "on the highest of alert." (Tr. Vol. 3 at 140). According to O'Connor, if it had been dark in the evening when he returned home from work, his wife, who he had told about the Facebook posts, would ask him to make sure that someone was not hiding outside in the bushes. O'Connor testified that he "[s]houldn't have [had] to do that." (Tr. Vol. 3 at 140).

[25] After the State had rested, Haycraft moved for a directed verdict. He specifically argued that pursuant to the recently decided *Counterman v. Colorado*, 600 U.S. 66 (2023), "you can't limit somebody's first amendment freedom of speech unless there's some subjective understanding that the communications you're making are threatening in nature." (Tr. Vol. 4 at 84-85). Haycraft further argued that *Counterman* required evidence that he had "consciously disregarded a substantial risk that his communication would be viewed as threatening violence." (Tr. Vol. 4 at 85). According to Haycraft, there was "no evidence that . . . [he had] consciously disregarded a risk that his communication would be viewed as threatening violence." (Tr. Vol. 4 at 85).

[26] The trial court took the matter under advisement and recessed for lunch. Eighty minutes later, the trial court judge returned to the courtroom and told the parties that she had "reviewed a number of the cases provided – and maybe [she] didn't have enough time, but [she] just had appropriate time to consider" the directed verdict motion. (Tr. Vol. 4 at 94). The trial court denied Haycraft's motion, and the trial continued.

[27]     Haycraft testified that he had never intended to threaten O'Connor with any of his Facebook posts. He also testified that he did not believe that O'Connor would see his Facebook posts because he had posted them to friends only, and O'Connor was not one of his Facebook friends. In addition, he agreed that he had never told anyone to convey the Facebook posts to O'Connor and that he had had no understanding or belief that his Facebook posts would be conveyed to O'Connor. Haycraft further agreed that even if O'Connor had seen the posts, Haycraft had had no understanding or belief that the posts would invoke fear in O'Connor. In addition, Haycraft testified that although he had O'Connor's cell phone number, he had never directly contacted O'Connor following his termination.

[28]     Weaver testified that she did not believe that Haycraft's Facebook posts were meant to be threatening. Specifically, Weaver explained that she and Haycraft had been in a relationship for several years and that over those years, Haycraft had "vent[ed] a lot." (Tr. Vol. 4 at 109). According to Weaver, Haycraft often said things that he should not have said but later came back to apologize.

[29]     At no time during the trial did the State set forth which Facebook post supported the misdemeanor charge and which Facebook post supported the felony charge. Rather, during its closing argument, the State told the jurors to look through the Facebook posts and simply argued that it had shown the jury "every element of the offenses." (Tr. Vol. 5 at 40).

[30] At the end of the trial, the trial court read the jury the final instructions, which included the charging informations alleging that Haycraft had committed the offenses on or about March 23, 2020, April 30, 2020, and/or June 12, 2020. Although the jury was instructed "not [to] sign any verdict form for which there is not unanimous agreement[,]" the jurors were not specifically instructed that they had to reach a unanimous decision as to which Facebook post and comments, if any, constituted Class A misdemeanor intimidation and which Facebook post and comments, if any, constituted Level 6 felony intimidation. (App. Vol. 3 at 117, Tr. Vol. 5 at 48).

[31] The jury convicted Haycraft of both counts. Following a sentencing hearing, the trial court sentenced Haycraft to a two (2) year sentence in the Department of Correction but suspended the sentence to probation.[4]

[32] Haycraft now appeals.

## Decision

[33] Haycraft argues that his Facebook posts and comments were protected by the First Amendment. He specifically contends that his "First Amendment rights were infringed due to the State not proving Haycraft had a subjective understanding of the threatening nature of the Facebook posts." (Haycraft's Br.

---

[4] As the State points out, the trial court ordered the sentences for the two convictions to run concurrently with each other for an aggregate sentence of two years. However, the trial court did not set forth the individual sentences for each count.

4). The gravamen of his argument is that there is insufficient evidence to support his convictions because the State did not present sufficient evidence that he had some understanding of his statements' threatening character and had consciously disregarded a substantial risk that his conduct would be viewed as threatening.

[34] When faced with a challenge to the sufficiency of the evidence, we apply a well-settled standard of review that leaves the determination of the weight of the evidence and the credibility of the witnesses to the finder of fact. *Moone v. State*, 250 N.E.3d 1101, 1106 (Ind. Ct. App. 2025), *trans. pending*. We consider only the evidence most favorable to the judgment and will affirm a defendant's conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id*.

[35] However, despite this deferential standard of review, when the constitutional protection for a defendant's speech hinges on state-of-mind issues, such deferential review "creates an unacceptable risk of under-protecting speech." *Id*. at 1107 (cleaned up). "It is our constitutional duty, then, to make an independent examination of the whole record, so as to assure ourselves that the conviction does not constitute a forbidden intrusion on the field of free expression." *Id*. (cleaned up). We cannot delegate this duty to the fact-finder and must independently review the record de novo. *Id*.

[36] "The First Amendment to the United States Constitution does not absolutely protect all categories of speech and means of expression." *Id*. For example, the

First Amendment does not protect speech that constitutes a true threat. *Id*. In *Counterman v. Colorado*, 600 U.S. at 66, the United States Supreme Court explained that true threats are "serious expressions conveying that a speaker means to commit an act of unlawful violence." *Counterman*, 600 U.S. at 74 (cleaned up).

[37] Before *Counterman*, an Indiana court had to determine whether a true threat had occurred by analyzing whether "the speaker [had] intended his communications to put his targets in fear for their safety." *Moone*, 250 N.E.3d at 1107-08 (cleaned up). However, in the *Counterman* case, the United States Supreme Court held that "the State must prove in true-threats cases that the defendant had some understanding of his statements' threatening character." *Counterman*, 600 U.S. at 73. Further, in *Counterman*, the Supreme Court lowered to a reckless standard the mens rea for determining whether a statement is a true threat that is unprotected by the First Amendment. *Id*. at 79. Specifically, the Supreme Court explained that "[i]n the threats context, it means that a speaker is aware that others could regard his statements as threatening violence and delivers them anyway."[5] *Id*. (cleaned up).

[38] Applying the *Counterman* standard to Haycraft's March 23 Facebook post, we first note that although Haycraft had O'Connor's cell phone number, Haycraft

---

[5] When adopting the reckless mens rea for determining whether a statement is a true threat, the United States Supreme Court explained as follows: "And of particular importance, we prevent the States from convicting morally culpable defendants. For reckless defendants have done more than make a bad mistake. They have consciously accepted a substantial risk of inflicting serious harm." *Counterman*, 600 U.S. at 80.

did not directly contact O'Connor. Rather, Haycraft made the March 23 Facebook post private to friends only. Further, before making the March 23 Facebook post, Haycraft had deleted all but three of his Meyer co-workers from his list of Facebook friends. He considered those three co-workers to be friends because they had socialized together outside of work. In addition, Haycraft believed that those three co-workers knew him well enough to know when he was venting. He did not believe that O'Connor would see the post because O'Connor was not one of his Facebook friends. He never told anyone to show the Facebook post to O'Connor, and he did not believe that any of his Facebook friends would do so. Based on these facts and circumstances, we agree with Haycraft that the State failed to prove that Haycraft had some understanding of his statements' threatening character and that Haycraft consciously disregarded a substantial risk that his conduct would be viewed as threatening. Accordingly, we conclude that the March 23 Facebook post was not a true threat, and it was protected by the First Amendment.

[39] Regarding the April 30 Facebook post and comments, we note that it was unclear from the record which comments Haycraft had posted when Zehr and other employees had shown the post to O'Connor. In any case, Haycraft did not contact O'Connor directly, and Haycraft made the April 30 Facebook post and comments private to friends only. As with the March 23 Facebook post, Haycraft did not believe that O'Connor would see the post because O'Connor was not one of his Facebook friends. He never told anyone to show the Facebook post to O'Connor, and he did not believe that any of his Facebook

friends would do so. Based on these facts and circumstances, we again agree with Haycraft that the State failed to prove that Haycraft had some understanding of his statements' threatening character and that Haycraft consciously disregarded a substantial risk that his conduct would be viewed as threatening. Accordingly, we conclude that the April 30 Facebook post and comments did not constitute a true threat, and these communications were protected by the First Amendment.

[40] After Haycraft had made the March 23 and April 30 Facebook posts and comments, Detective Lents went to Haycraft's house to tell Haycraft to stop making the Facebook posts and comments because his former employer had considered them to be threatening in nature. Thus, when Haycraft made the June 12 Facebook post and comments, he had some understanding of the threatening nature of this Facebook post and comments, and he consciously disregarded a substantial risk that his conduct would be viewed as threatening. Accordingly, we conclude that the June 12 Facebook post and comments constituted a true threat, and these communications were not protected by the First Amendment.

[41] Although we have determined that the June 12 Facebook post and comments constituted a true threat, our analysis does not end with that conclusion because the trial court failed to provide a unanimity instruction to the jury. Our review of the record reveals that the trial court read the jury preliminary and final instructions on intimidation. Both sets of instructions incorporated the charging informations. Specifically, the instructions, and the charging

informations for both Class A misdemeanor and Level 6 felony intimidation, provided that the State had to prove that Haycraft had committed the charged offenses on or about March 23, 2020, April 30, 2020, *and/or* June 12, 2020.

[42] Indiana courts have long required that a verdict of guilty in a criminal case must be unanimous. *Baker v. State*, 948 N.E.2d 1169, 1174 (Ind. 2011), *reh'g denied*. Disjunctive jury instructions make it difficult to ascertain whether the jury's verdict was reached unanimously. *See id*. at 1175. Our Indiana Supreme Court has described the ambiguity in such instructions:

> [A] disjunctive instruction, which allows the jury to find a defendant guilty if he commits either of two or more underlying acts, either of which is in itself a separate offense, is fatally ambiguous because it is impossible to determine whether the jury unanimously found that the defendant committed one particular offense.

*Id*. *See also Dunn v. State*, 230 N.E.3d 910, 916 (Ind. 2024) (warning against using and/or, especially in jury instructions because it is ambiguous and potentially imprecise). If the State chooses not to designate a specific act to rely upon in proving a particular charge, "then the jurors should be instructed that in order to convict the defendant they must either unanimously agree that the defendant committed the same act or acts or that the defendant committed all of the acts described by the victim and included within the time period charged." *Baker*, 948 N.E.2d at 1177.

[43] Here, the trial court instructed the jury that the State had to prove, among other things, that on or about March 23, 2020, April 30, 2020 *and/or* June 12, 2020,

Haycraft communicated threats to O'Connor. As written, the instructions provided that the State could prove that Haycraft committed intimidation on either March 23, 2020, April 30, 2020, or June 12, 2020. The trial court's preliminary and final instructions did not include any further instructions on the offenses or a unanimity instruction. Further, at no time during the trial did the State set forth which Facebook post supported the misdemeanor charge and which Facebook post supported the felony charge. In addition, during its closing argument, the State told the jurors to look through the Facebook posts and simply argued that it had shown the jury every element of the offenses. In sum, the charging informations, the preliminary and final jury instructions, and the State's argument all referenced three alleged intimidation incidents within two single charges. Under these circumstances, the trial court should have provided the jury with a unanimity instruction.

[44] Because the trial court did not provide the required unanimity instruction, we are unable to determine whether the jury convicted Haycraft of Class A misdemeanor intimidation and Level 6 felony intimidation based on the March 23 Facebook post or the April 30 Facebook post and comments, which were not true threats, or based on the June 12 Facebook post and comments, which was a true threat. Therefore, we reverse Haycraft's convictions for both Class A misdemeanor intimidation and Level 6 felony intimidation and remand this case to the trial court with instructions to vacate Haycraft's convictions.

[45] Reversed and remanded with instructions.

May, J., and Brown, J., concur.

ATTORNEY FOR APPELLANT

Paul M. Blanton
Kyle C. Beach
Blanton & Pierce, LLC
Jeffersonville, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Alexandria Sons
Deputy Attorney General
Indianapolis, Indiana